## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     Crim. No. 22-CR-10031-AK |
| | ) |
| JOSEPH CORREA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER
## ON DEFENDANT'S FIVE MOTIONS TO SUPPRESS

**ANGEL KELLEY, D.J.**

On December 13, 2021, a criminal complaint was filed against defendant Joseph Correa ("Correa") and 19 other co-defendants alleging: (1) conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl and 5 kilograms of cocaine pursuant to 21 USC § 846, (2) distribution of and possession with intent to distribute 500 grams or more of cocaine and aiding and abetting pursuant to 21 USC § 841(a)(1) and (b)(1)(B)(ii), (3) possession of a firearm in furtherance of a drug trafficking offense pursuant to 18 USC § 924(c)(1)(A)(i), and (4) money laundering pursuant to 18 USC § 1956(h).[1]

Now before the Court are Correa's five Motions to Suppress: (1) Motion to Suppress evidence derived from a GPS tracking device [Dkt. 801], (2) Motion to Suppress evidence seized from the second floor of Urb. Villa Del Carmen [Dkt. 803], (3) Motion to Suppress evidence derived from three wiretaps [Dkt. 806], (4) Motion to Suppress evidence seized from 190

---

[1] The Complaint, [Dkt. 1], initially named 20 defendants. Two days later, a criminal complaint was filed against Pablo Rosario Pablo on related charges [21-MJ-06770-MPK, Dkt. 1]. Pablo was subsequently indicted with Correa and the other 20 defendants on February 3, 2022. [Dkt. 108].

Carleton Street [Dkt. 810], and (5) Motion to Suppress pole camera evidence [Dkt. 796].  The

Court held a hearing on the motions on July 22, 2024.  For the following reasons, Correa's

Motions to Suppress [Dkts. 796, 801, 803, 806 and 810] are **DENIED**.

## I.    BACKGROUND

This case is the result of a multi-year drug-trafficking investigation.  On or before May

2020, Detective Robert R. LeFebre, working on assignment as a Task Force Officer to

Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), joined the

investigation into an alleged cocaine and fentanyl distribution organization based out of

Lawrence, Massachusetts.  [Dkt. 1-2 ¶¶ 2, 11].  As part of the investigation, law enforcement

conducted physical surveillance, performed wiretaps, reviewed toll records and GPS tracking of

vehicles, conducted interviews, worked with informants, executed controlled purchases of

cocaine, seized drugs, and analyzed recorded surveillance.

As relevant to these motions, between April 9 and April 21, 2021, agents executed search

warrants on five U.S. Postal Service Priority Mail packages sent on Correa's behalf from Puerto

Rico to addresses in Massachusetts and New York.  [Id. ¶ 35].  In total, agents seized

approximately 5.8 kilograms of cocaine from the packages.  [Id.].  Over the next two months,

agents recorded calls between Correa and individuals whose telephones were already being

intercepted as part of the investigation.  On the calls, Correa discussed deliveries of drugs.

[Id. ¶ 37].

On May 20, 2021, agents installed a pole camera on a utility pole in the area of 190

Carleton Street, which is a multi-family residence.  Agents believed that Correa lived in the first-

floor apartment with co-defendant Mayi Rosario ("M. Rosario"), who is the mother of his

children.  [Id. ¶ 219].

On June 11, 2021, LeFebre sought and received authorization to intercept Correa's telephone communications. [Dkt. 850-2]. On July 13, LeFebre sought and obtained a tracking warrant authorizing the installation and use of a GPS tracking device on a black 2012 Acura ZDX ("the Acura") registered to M. Rosario at 190 Carleton Street, Lawrence, Massachusetts. [Dkt. 845 at 1]. On June 25, LeFebre sought and received authorization to intercept another one of Correa's telephone numbers. [Dkt. 850-3]. Authorization to extend the use of the wiretap was granted on July 23. [Dkt. 850-4].

From June to December 2021, agents intercepted dozens of communications between Correa and associates discussing buying and selling drugs, drug delivery and procurement, and linked Correa's movements to drug trafficking meet-ups. [Dkt. 1-2].

On December 13, 2021, the government charged twenty individuals, including Correa, with drug trafficking violations. [Id.]. The affidavit supporting the Criminal Complaint, signed by LeFebre, was also submitted in support of a search warrant authorizing agents to search nine locations, including Correa's residence at 190 Carleton Street. [Id.]. The next day, LeFebre sought and obtained a warrant to search the first and second floors of Correa's mother's residence, located at Urb. Villa Del Carmen L-17 Calle Bayamon in Caguas, Puerto Rico ("Urb. Villa Del Carmen"). [Dkt. 847-1].

## II.    LEGAL STANDARD

The Fourth Amendment to the United States Constitution provides that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. U.S. Const. amend. IV. As articulated by the First Circuit: A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the commission element, and (2) enumerated

evidence of the offense will be found at the place searched—the so-called nexus element.  United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015) (quotation marks omitted).

Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found at a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  Courts assess probable cause "on the basis of the totality of the circumstances."  United States v. Flores, 888 F.3d 537, 543 (1st Cir. 2018).

A prior judicial determination of probable cause is entitled to great deference by the reviewing court.  Gates, 462 U.S. at 288; see also United States v. Bregu, 948 F.3d 408, 414 (1st Cir. 2020) (noting that "when the Motion to Suppress is based on an allegedly deficient warrant, we give significant deference to the magistrate judge's initial probable cause determination, reversing only if there is no substantial basis for concluding that probable cause existed") (internal quotations omitted).

If the reviewing court determines that a warrant issued without probable cause, then the evidence obtained from the resultant search is ordinarily suppressed.  United States v. Sheehan, 70 F.4th 36, 51 (1st Cir. 2023); see also, United States v. Calandra, 414 U.S. 338, 354 (1974).  However, the Supreme Court has carved out "good faith" exceptions to the exclusionary rule which restrict suppression to only those instances when "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  United States v. Peltier, 422 U.S. 531, 542 (1975).  See, e.g., United States v. Leon, 468 U.S. 897, 926 (1984) (holding that where "officers' reliance on the magistrate's [subsequently reversed] determination of probable cause was objectively reasonable . . . application of the extreme sanction of exclusion is inappropriate"); Illinois v. Krull, 480 U.S. 340, 358 (1987) (extending the "good faith" exception to instances where an

officer's "reliance on the [later invalidated] statute . . . was objectively reasonable"); <u>Davis v. United States</u>, 564 U.S. 229, 241 (2011) (concluding that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

## III.    DISCUSSION

Correa challenges the sufficiency of the warrants authorizing agents to install a GPS tracking device on his car [Dkt. 801], search the second floor of Urb. Villa Del Carmen [Dkt. 803], intercept his telephone communications [Dkt. 806], and search 190 Carleton Street [Dkt. 810]. Additionally, Correa submits that installing a pole camera in the area of his residence at 190 Carleton Street constituted a warrantless "search" under the Fourth Amendment, the fruits of which must be suppressed. [Dkt. 796].

### A.    Sufficiency of the Warrant Applications

Correa contends that the warrant issued for GPS monitoring as well as the warrants to search the second floor of his mother's residence at Urb. Villa Del Carmen and his residence at 190 Carleton Street lacked probable cause. In order to determine whether the warrants were supported by probable cause, the Court must review each affidavit, bearing in mind that affidavits supporting warrants are presumptively valid, <u>see</u> <u>United States v. McLellan</u>, 792 F.3d 200, 208 (1st Cir. 2015).

#### 1.    GPS Tracker

Correa asserts that the warrant for GPS monitoring, authorized on July 13, 2021, was issued in violation of the Fourth Amendment because the affidavit (1) provided only conclusory statements that Correa was engaged in criminal activity, (2) did not demonstrate any nexus between the alleged criminal activity and the Acura, and (3) relied on the affiant's "training and experience" rather than evidence to establish probable cause. [Dkt. 802 at 2-6]. Correa

concludes that there was no probable cause and the "good faith" exception does not apply, therefore the GPS evidence must be suppressed.  [Id. at 7].

a)    The Affidavit

The affidavit attached to the warrant application provided the following information: Since December 2020, agents had been conducting court-authorized interceptions of telephone communications used by targets of a drug investigation.  [Dkt. 845-1 ¶ 13].  On June 25, 2021, officers received authorization to intercept wire and electronic communications over a telephone used by Correa.  [Id.].

On the morning of June 26, 2021, agents intercepted a call between Correa and a female identified as "Ashley."  [Id. ¶ 14].  Ashley said she needed "a finger"[2] and Correa agreed, asking, "Where do we meet?"  Ashley replied, "In my house."  Later that morning, Ashley called Correa and asked, "Where are you?"  Correa replied, "Fifteen minutes, so give me ten minutes, and I'll be at your house."  [Id.].  A short while later, agents observed Correa leave his residence at 190 Carleton Street and drive away in the Acura.  [Id. ¶ 18].  As he left, Correa told Ashley over the phone, "I'll be there in two minutes, you heard, Ash?"  [Id. ¶ 19].  A few minutes later, Correa told Ashley, "Come out."  [Id. ¶ 20].

That same morning, agents intercepted a call between Correa and a man identified as "Gordo."  [Id. ¶ 16].  During the call, Gordo said, "Um, my customer, she wants four."  Correa responded, "Give me a few minutes."  [Id.].  Less than an hour later, Gordo told Correa, "She, she already arrived."  Correa responded, "I only have two right now, Gordo . . . .  I'll bring you these two now."  [Id. ¶ 22].  A minute later, officers observed Correa leave 190 Carleton Street in

---

[2] LeFebre stated that, based on his training and experience and familiarity with the investigation, a "finger" referred to 10 grams of heroin and/or fentanyl.  [Dkt. 845-1 ¶ 15].

the Acura.  [Id. ¶ 24].  After a few minutes, Correa texted, "Here" and Gordo replied, "Sounds good."  [Id. ¶ 22].

Later that day, Correa asked Gordo, "Do you want the other two?"  [Id. ¶ 25].  Gordo affirmed, and Correa said, "Alright, so I'm getting there."  A few minutes later, Correa said, "I'm outside, bro."  [Id.].

On July 1, 2021, agents intercepted multiple calls between Correa and Gordo.  [Id. ¶¶ 27-31].  Correa asked, "where are you going to see Edwin?"  Gordo responded, "Tell him to come in."  Correa said, "There are two" and Gordo responded, "Two. Okay."  [Id. ¶ 27].  On another call, Gordo told Correa, "I just need to give you an update.  I only have two chocolate."[3]  Correa responded, "Alright, bro."  [Id. ¶ 28].  A few hours later, Gordo told Correa "I have nothing left."  [Id. ¶ 31].  Correa asked, "Who went to get the chocolate?"  Gordo replied, "Um, Alex."  Correa said, "I'm waiting on something, and then I'm on my way there."  [Id.].  About half an hour later, Correa was observed leaving 190 Carleton Street and driving away in the Acura.  [Id. ¶ 33].  Three minutes later, Correa said, "Gordo, I'm outside in the parking spot.  Umm, bring me only the thousand bucks from the chocolate, bro."  [Id.].

On July 9, 2021, agents intercepted a call between Correa and a man identified as "Kevin."  [Id. ¶ 37].  Kevin said, "Um, bring me two. Separate."  Correa asked, "Two three-and-a-half?"  [Id.].  Kevin affirmed.  A few minutes later, Correa was observed leaving 190 Carleton Street and driving away in the Acura.  [Id. ¶ 40].  Two minutes after that, Correa said, "I'm downstairs."  [Id. ¶ 39].  Kevin responded, "Alright, I'm coming out now."  [Id.].  Several minutes later, Correa was observed returning to 190 Carleton Street in the Acura.  [Id. ¶ 40].

---

[3] LeFebre stated that, based on his training and experience and familiarity with the investigation, "chocolate" referred to heroin or fentanyl."  [Dkt. 845-1 ¶ 30].

b)    Probable Cause

From these intercepted communications and surveillance of the Acura, LeFebre

concluded that Correa was involved in drug distribution and that he used the Acura in connection

with the illegal activity.  [Id. ¶ 42].

Contrary to Correa's assertions, the affidavit is far from conclusory, nor does it rely

solely on LeFebre's knowledge and experience.  Instead, it contains verbatim exchanges between

Correa and associates discussing thinly veiled criminal activity.  Although LeFebre uses his

training and experience to interpret some of the code names, his expertise is not critical to

understanding that criminal conduct is likely at play.  Many of the excerpts are self-explanatory.

Furthermore, the affidavit describes how Correa left 190 Carleton Street and drove the Acura at

exactly the times he said he was meeting with his associates.  This is sufficient to establish a

nexus between the alleged drug activity and the Acura.  The magistrate judge's conclusion that a

tracking warrant on the Acura could lead to evidence of drug distribution was justified.[4]

Accordingly, the GPS tracking warrant was supported by probable cause, and Correa's Motion to

Suppress [Dkt. 801] is **DENIED**.

### 2.    Search of Urb. Villa Del Carmen

Correa contends that the affidavit attached to the warrant to search the second floor of

Urb. Villa Del Carmen did not show probable cause because (1) it provided only conclusory

statements without specific and articulable facts of ongoing criminal activity, (2) it did not

demonstrate any nexus between the alleged criminal activity and Urb. Villa Del Carmen, (3) the

evidence was "stale," (4) it relied on the affiant's "training and experience" rather than evidence,

and (5) there was no evidence that Correa's mother, co-defendant Madeline Correa Dones, was

---

[4] As the warrant was properly issued, Correa's argument that the "good faith" exception does not apply is moot.

sleeping on the second floor. [Dkt. 804 at 3-9]. Correa asserts that the "good faith" exception does not apply, therefore the fruits of the search of the second floor of Urb. Villa Del Carmen must be suppressed. [Id. at 9-10].

a)    <u>The Affidavit</u>

The affidavit describes Urb. Villa Del Carmen as a two-story residence, with second-floor access to an in-law apartment via an external staircase. [Dkt. 847-1 ¶ 13]. It explains that agents had conducted periodic surveillance of Urb. Villa Del Carmen since April 2021, and during that time they had seen Correa Dones coming and going from the first-floor apartment and believed she was sleeping there. [Id. ¶ 14 n.2]. However, in December 2021, Correa Dones was observed twice leaving the second-floor apartment early in the morning and returning to the first-floor apartment. [Id.]. Based on these observations, LeFebre believed that Correa Dones was, at that time, occupying both apartments. [Id. ¶ 14].

The affidavit then details the following instances of surveillance, seizures, and intercepted phone calls to suggest that Correa Dones was involved in the drug conspiracy and used her residence to package drugs:[5] From April 8 to April 12, 2021, Correa Dones was observed entering and exiting both floors of Urb. Villa Del Carmen and making multiple trips to the post office carrying parcels, often in the company of other individuals. [Id. ¶¶ 21-27]. Then, between April 9 and 21, 2021, agents executed search warrants on five packages that video and physical surveillance confirmed were sent by Correa Dones and the individuals seen with her frequenting the post office. [Id. ¶ 29]. In total, agents seized approximately 5.8 kilograms of cocaine from the packages. [Id.].

---

[5] At the hearing held on July 22, 2024, the Court inquired as to whether the Government contested Correa's standing to claim Fourth Amendment protection over Urb. Villa Del Carmen and gave it time to respond in writing. [Dkt. 856]. On July 26, 2024, the Government stated that it did not contest Correa's interest in Urb. Villa Del Carmen under the Fourth Amendment. [Dkt. 861].

On April 16, 2021, pursuant to a court-authorized wiretap on co-defendant Elvis DeJesus's phone number, agents intercepted a call between DeJesus and Correa.  [Id. ¶ 30]. Correa asked, "[D]ude, that thing never arrived to your house, bro?"  DeJesus answered, "It never arrived."  Correa responded, "I also have my stuff, remember that they never arrived last Wednesday, nor last Tuesday.  There's five up in the air, son.  Five, son . . . .  I'm not going to be sending anything through the mail."  [Id.].

On July 30, 2021, agents seized a package sent from Puerto Rico to 33 Portland Street, the address of the residential structure where co-defendant Sonyi Rosario ("S. Rosario")[6] lived. [Id. ¶ 32].  The package contained half a kilogram of cocaine.  [Id.].  A few days later, agents intercepted a call between Correa and Correa Dones which contained the following exchange:

| Correa: | Did they tell you already, one of my boxes didn't make it, mommy. |
| Correa Dones: | No, Joe! But the one from whom? |
| Correa: | The one from Anthony |
| Correa Dones: | Yours? . . . . Oh my goodness! Where did he send it from? |
| Correa: | From the new one, mom. |
| Correa Dones: | From the same place I sent it from?" |
| Correa: | Yes, but it wasn't there, but it wasn't there, it wasn't over there.  It wasn't over there.  It was brought over here." |
| Correa Dones: | Oh, shit.  You will have to change the address once again.  I saw a box, Joe, from the same postal service.  It's a bit smaller, but it looks the same." |
| Correa: | Yes, Mommy, we have to change all those boxes.  All the boxes they have over there, we have to bring them . . . . They stole it from me, mommy. |
| Correa Dones: | They stole it, but which address did you send it to, to your house? |
| Correa: | No, that one arrived fine.  That one arrived first.  The one, the one that you sent with Alan, with Miriam and Alan, those were fine. |
| Correa Dones: | What about the one for Bebo and Luis, did those arrive? |

---

[6] LeFebre stated in a later affidavit that, based on intercepted communications, he believed that Sonyi Rosario is Mayi Rosario's sister. [Dkt. 1-2 ¶ 112].

| | |
|---|---|
| Correa: | Yes, those arrived. All of them arrived except one of mine. |
| Correa Dones: | Damn, if I knew, I would have sent it to you from over here. |
| Correa: | I don't think it was that. I think it was because I used Sonyi's address a couple of times. |
| Correa Dones: | Ah, that's the one that went to, let me take a look at the address, that way I won't forget." |
| Correa: | 33 Portland. |
| Correa Dones: | Portland, yes, damn! . . . And it was written correctly, right, Joe? . . . . [Y]ou cannot use that address anymore." |
| Correa: | I cannot use Lawrence any longer, mommy. |
| Correa Dones: | So you will have to look for someone that lives in Haverhill, Joe, and talk to that Dominican guy, but don't pay him much, because you're not sending that much." |
| Correa: | Yeah, I have another one there to send. I'm going to continue to, I'm going to send halves two more times, and then when I recuperate the money, I'll continue sending whole ones . . . . [B]e careful, over there, mommy, you hear. Be careful, always. Be careful there. Let's hope that these people don't think that we have something there and try to go in the house, mommy." |
| Correa Dones: | Nah, I changed the locks here, and I'm calm. Nothing happens here. I locked all the gates. |
| Correa: | Gordo's door, tell Julio to lock them well . . . . And if anything, mommy, if you see something weird, what you have to do is, that thing there is ready. You just have to pull the trigger and kill whomever. That thing there is ready." |
| Correa Dones: | Oh, no, don't worry about that. I didn't find it, Joe. |
| Correa: | Luis left it in the, in the drawer at the bottom. It's in the drawer, and that's ready, mommy. The only thing you have to do is pull the trigger on whoever goes in there, because you never know, mommy. You never know with people." |
| Correa Dones: | If anyone tries to come in here, I'll, I'll, I'm not going to pretend, because this is my house, and I can kill whoever I want. And I'll take the gun, and I'll throw it away. |

[Id. ¶ 35].

11

On November 26, agents intercepted a phone call wherein Correa Dones told Correa that Anthony[7] had been calling her "for coke." [Id. ¶ 37]. They then discussed whether a certain package had arrived, and Correa asked his mother, Correa Dones, to confirm the return address that she had listed. Correa Dones replied, "Aguadilla Street, L-18 Villa Carmen." [Id.].

Later that day, agents intercepted a phone call between Correa and Anthony, wherein Correa asked Anthony to "check on top of the cabinets . . . . Right there at my mom's house, on top of the cabinets." [Id. ¶ 39]. Anthony responded, "Yeah, I see it, bro. I saw it . . . . I don't wanna fly that shit. I don't want to travel." Correa asked, "Could you bring like a twenty of those, too?" to which Anthony replied, "No, no, no. That's too much, bro." Correa suggested, "Inside the pills." Anthony repeated, "That's too much bro. I'm almost leaving to the airport, bro." Correa then proposed that Anthony bring "like a little gram or something" because "it's nothing here." Correa and Anthony then discussed how to package "this," saying to "double bag it" and "put it inside some pants." [Id.].

b)    Probable Cause

As the summaries above show, the affidavit submitted with the warrant application is far from conclusory. It describes Correa Dones's April movements between the apartments and her trips to the post office, which then were linked with the five packages seized containing drugs. [Id. ¶¶ 21-29]. It contains verbatim conversations between Correa Dones and Correa as well as between Correa and Anthony discussing how packages should be shipped from Correa Dones and associates and which packages had been intercepted. [Id. ¶¶ 30, 32, 35, 37]. And it references two occasions where Correa spoke about illicit objects hidden in Urb. Villa del Carmen: a firearm, [id. ¶ 35], and drugs, [id. ¶ 39]. While the affidavit does not definitively

---

[7] DeFebre stated that he believed "Anthony" was Anthony Correa, Correa's cousin (referred hereinafter as "Anthony"). [Dkt. 847-1 ¶ 36].

prove that Correa Dones was sleeping on the second floor, such proof is not required to show probable cause.  See United States v. Bain, 155 F. Supp. 3d 107, 124-25 (D. Mass. 2015), aff'd, 874 F.3d 1 (1st Cir. 2017) (explaining that "conclusive proof" of residence is not required when search warrant affidavit includes "additional facts—beyond the facts suggesting [defendant resided at the address]—to strengthen the inference that evidence of [defendant's] drug dealing would be found at the apartment").

Moreover, this evidence is sufficient to establish a nexus between both floors of Urb. Villa Del Carmen and illegal activity.  Correa Dones was observed entering and exiting both floors of the building before and after visiting the post office to mail packages containing drugs. [Dkt. 847-1 ¶¶ 21-29].  Her conversations with Correa over the seven months support the conclusion that she was personally involved in sending drugs from Puerto Rico to the United States.  [Id. ¶¶ 30, 32, 35, 37].  She was familiar with which boxes to use and which addresses were no longer safe.  [Id. ¶ 35].  She was seen frequenting both floors of Urb. Villa Del Carmen in April and in December.  [Id. ¶¶ 14, 14 n.2, 21-29].  Finally, two conversations explicitly refer to illicit items hidden inside Urb. Villa Del Carmen, without specifying which floor or apartment.  [Id. ¶¶ 35, 39].  These facts are more than enough to demonstrate a "fair probability that contraband or evidence of a crime will be found" on both floors of Urb. Villa Del Carmen. [Id.]; Gates, 462 U.S. at 238.

Correa next argues that the evidence in the affidavit was stale.  The repeated nature of the transcribed conversations regarding packaging and delivery refutes this claim.  Agents did not keep Correa Dones under constant surveillance, therefore observations regarding her movements are limited to April and December.  However, the conversations between Correa Dones, Correa,

and others in April, August and November discussing drug shipments are sufficient to show probable cause that Urb. Villa Del Carmen was being used for drug activity on an ongoing basis.

Correa's attempt to characterize the affidavit as LeFebre's interpretation of events based on his training and experience rather than objective evidence is similarly unpersuasive. True, the affidavit includes paragraphs wherein LeFebre references his training and experience to explain what he surmised was happening within Urb. Villa Del Carmen and describe the ways drug traffickers typically use residences and technologies. [Id. ¶¶ 31, 34, 36, 38, 40, 42-54]. And true, the warrant would be deficient if it relied solely on these paragraphs to find probable cause. However, that is not the case here. LeFebre's comments on the recitation of evidence are not essential to the probable cause determination, as the evidence derived from surveillance, seizures, and intercepted phone calls speaks for itself.[8]

Accordingly, Correa's Motion to Suppress the fruits of the search of Urb. Villa Del Carmen's second floor [Dkt. 803] is **DENIED**.

### 3.    Wiretaps

Correa contends that the affidavits submitted with the warrant applications for three wiretaps of his phone numbers lacked probable cause because (1) they provided only conclusory statements without specific and articulable facts of ongoing criminal activity, (2) there was no showing that the informants were reliable, (3) the information in the warrants was stale, (4) the warrants relied on the affiant's "training and experience" rather than evidence to establish probable cause, and (5) there was no showing of necessity. [Dkt. 807 at 6-18]. Correa concludes that the "good faith" exception does not apply, therefore the evidence derived from the wiretaps must be suppressed. [Id. at 18-19].

---

[8] As the warrant was properly issued, Correa's argument that the "good faith" exception does not apply is moot.

a)      The Affidavits

On June 11, 2021, LeFebre submitted a warrant application identifying Correa as a Target and sought authorization to intercept four telephone numbers, including one attributed to Correa known as "Target Telephone #10" ("TT10"). [Dkt. 850-2].[9]  Agents first became aware of TT10 when it was used to book flight reservations to Puerto Rico. [Id. ¶ 52]. When agents inputted TT10 into CashApp, it auto populated with the name "Joseph Correa." [Id.]. Agents then confirmed that the telephone number belonged to Correa by matching court-authorized, precise location tracking of the phone to Correa's movements and matching the voice of the user of TT9 to that of TT10. [Id.].

The affidavit states that between April 9 and April 21, 2021, agents executed search warrants on U.S. Postal Service Priority Mail packages sent on behalf of Correa to addresses in Massachusetts and New York. [Id. ¶ 17(x)]. Each package contained between half a kilogram and two kilograms of cocaine. [Id.]. It describes how on May 11, 2021, pursuant to a wiretap on DeJesus's telephone, agents intercepted a call between Correa, on TT10, and DeJesus discussing whether to sell "400" or "a whole one."[10] [Id. ¶ 53]. It further explains how, pursuant to a court-authorized pen register and trap and trace device, agents had ascertained that between May 11, 2021, and June 8, 2021, there were 159 calls between TT10 and a phone number associated with Correa's brother, co-defendant Luis Martinez, who in April was observed mailing a package containing cocaine from Puerto Rico on behalf of Correa. [Id. ¶¶ 17, 55-56].

The affidavit posits that Correa supplied DeJesus with cocaine, and that his brothers, co-defendants L. Martinez and Jose Martinez ("J. Martinez") assisted him with drug distribution and

_____

[9] The affidavit states that another phone number attributed to Correa, "Target Telephone #9" ("TT9"), was subject to an earlier wiretap authorized on April 23, 2021. [Dkt. 850-2 ¶ 22].

[10] LeFebre stated that, based on his training and experience and familiarity with the investigation, "a whole one" referred to a kilogram of drugs. [Dkt. 850-2 ¶ 54].

his mother assisted with mailing packages containing cocaine.  [Id. ¶ 95].  It describes the techniques law enforcement was using to build its case, including the use of confidential sources and cooperating witnesses, physical surveillance, execution of warrants for precise location information for telephones used by some of the Target Subjects, use of a cell-site simulator to identify telephones used by some of the Target Subjects, use of Global Positioning System ("GPS") tracking devices on cars used by some of the Target Subjects, pen register and trap and trace devices, and interception of communications over nine Target Telephones.  [Id. ¶¶ 94-156].  However, the affidavit explains that despite these investigative measures, wiretaps were necessary to, as relevant here, identify who supplied Correa with drugs, how he remitted payment for drugs received, how he laundered his drug proceeds, and how he transported drugs from Puerto Rico into the United States.  [Id. ¶ 98-156].  District Court Judge F. Dennis Saylor IV issued an order authorizing the interceptions.  [Dkt. 850 at 1-2].

On June 25, 2021, LeFebre submitted another warrant application for wiretaps, which this time included wire and electronic interception of another number associated with Correa, "Target Telephone 13" ("TT13").  [Dkt. 850-3 ¶ 7].  Agents identified TT13 from an intercepted phone call wherein Correa read out his new number (TT13 less the area code) to an associate. [Id. ¶¶ 37-38].  The affidavit then describes an intercepted call from June 17, 2021, between Correa, using TT13, and J. Martinez wherein they discuss buying "a whole one" and selling it "at thirty-two" or "thirty-three."  [Id. ¶ 39].

It further explains how, pursuant to a court-authorized pen register and trap and trace device, agents ascertained that between June 15, 2021, and June 17, 2021, there were 19 calls between TT13 and a phone number believed to be associated with a man identified as Emmanuel Molina.  [Id. ¶ 42].  On June 14, 2021, Molina and Correa, using TT10, were intercepted

discussing how much "chocolate" Molina had.  [Id. ¶ 42 n.3].  Correa responded, "pass by here.
I have to give you three and a half for the guy."  [Id.].

Agents were also able to ascertain that between June 15, 2021, and June 17, 2021, there
were 12 calls and 5 text messages between TT13 and a phone number believed to be associated
with Ashley.  [Id. ¶ 43].  On June 14, 2021, Ashley was intercepted asking Correa, using TT10,
for a "finger" of "brown" and "three and a half of hard."[11]  [Id. ¶ 43 n.4].

The affidavit reiterates the techniques law enforcement was using to build its case,
including the use of confidential sources and cooperating witnesses, physical surveillance,
execution of warrants for precise location information for telephones used by some of the Target
Subjects, use of a cell-site simulator to identify telephones used by some of the Target Subjects,
use of Global Positioning System ("GPS") tracking devices on cars used by some of the Target
Subjects, pen register and trap and trace devices, and interception of communications over ten
Target Telephones.  [Id. ¶¶ 67; 70-128].  However, it concludes that further wiretaps were
necessary to, as relevant here, identify who supplied Correa with drugs, how he remitted
payment for drugs received, how he laundered his drug proceeds, and how he transported drugs
from Puerto Rico into the United States.  [Id. ¶ 69].  As before, Judge Saylor issued an order
authorizing the interceptions.  [Dkt. 850 at 2].

On July 23, 2021, LeFebre submitted a warrant application to, as relevant here, continue
the wiretap of TT13.  [Dkt. 850-4].  The affidavit details three communications also described in
the affidavit seeking a warrant to use GPS tracking, supra.  Specifically, it describes the June 26,
2021, exchanges between Correa and Ashley, and Correa and Gordo, and the July 1, 2021,
exchange between Correa and Gordo.  [Id. ¶¶ 58-70; 71-80].  It also details seven other

_____

[11] LeFebre stated that, based on his training and experience and familiarity with the investigation, a "finger" referred
to 10 grams, "brown" referred to heroin or fentanyl, and the "hard" referred to crack cocaine.  [Dkt. 850-3 ¶ 43 n.4].

exchanges wherein Correa, using TT13, discusses meet-ups, package deliveries, and buying and selling "chocolates."  [Id. ¶¶ 81-109].

The affidavit reasserts the investigators' belief that Correa supplied DeJesus with cocaine, that his brothers L. Martinez and J. Martinez assisted him with drug distribution, and his mother assisted with mailing packages containing cocaine.  [Id. ¶ 113].  It also states the investigators' theory that (1) Molina worked as a drug courier for Correa and J. Martinez, (2) Rosario assisted Correa with receiving packages, (3) Felix brokered drug transactions between Correa and cocaine suppliers located in Puerto Rico, and (4) "UM2091" was a local drug supplier to Correa.  [Id.].

The affidavit then reiterates the techniques that law enforcement was using to build its case, including the use of confidential sources and cooperating witnesses, physical surveillance, execution of warrants for precise location information for telephones used by some of the Target Subjects, use of a cell-site simulator to identify telephones used by some of the Target Subjects, use of Global Positioning System ("GPS") tracking devices on cars used by some of the Target Subjects, pen register and trap and trace devices, and interception of communications over fourteen Target  Telephones.  [Id. ¶¶ 116-73].

Based on the affidavit, Judge Saylor issued an order authorizing the continued interception of TT13.  [Dkt. 850 at 2].

b)    Probable Cause

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, governs the rules for federal telephone wiretaps.  "Title III provides a comprehensive scheme for the regulation of electronic surveillance, prohibiting all secret interception of communications except as authorized by certain state and federal judges in response to

applications from specified federal and state law enforcement officials." <u>United States v. Rodrigues</u>, 850 F.3d 1, 6 (1st Cir. 2017) (quoting <u>Dalia v. United States</u>, 441 U.S. 238, 249 (1979)).

The First Circuit has clearly outlined what the government must show in order to obtain judicial authorization for a wiretap:

> At the outset, the government must adduce facts showing probable cause to believe that a particular defendant is linked to a particular crime. <u>See</u> [18 U.S.C. § 2518(3),] § 2518(3)(a). It must then adduce facts sufficient to support "probable cause for belief that particular communications concerning that offense" are likely to be obtained through the desired wiretap. <u>Id.</u> § 2518(3)(b). Next, the government must show that either the individual or the offense is sufficiently connected to the means of communication that it seeks to surveil. <u>See id.</u> § 2518(3)(d). Finally, the government must make a showing of necessity, that is, a showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." <u>Id.</u> § 2518(3)(c).

<u>United States v. Encarnacion</u>, 26 F.4th 490, 497 (1st Cir. 2022).

Here, Correa contends that the affidavits were deficient because (1) they were conclusory, (2) the informants mentioned were not shown to be reliable, (3) the information in the warrants was stale, (4) LeFebre relied on his training and experience rather than evidence, (5) the affidavit did not show necessity, and (6) the good faith exception does not apply. [Dkt. 807 ¶¶ 6-18].

The three affidavits submitted by LeFebre contain dozens of pages of specific details describing how Correa used telephones to communicate with co-conspirators regarding drug operations. They describe how Correa's phone numbers first became of interest and includes evidence in support of why intercepting his communications would likely be helpful to understanding the drug trafficking organization.

Specifically, the June 11 affidavit in support of intercepting TT10 describes how agents had already seized five packages sent on behalf of Correa, each containing between half a kilogram and two kilograms of cocaine.  [Dkt. 850-2 ¶¶ 17, 128].  Agents had already intercepted a conversation between Correa and DeJesus about whether to sell "400" or "a whole one."  [Id. ¶ 53].  Agents had already determined that, in less than a month, there were 159 calls between TT10 and L. Martinez, who was responsible for sending one of the packages of cocaine previously seized by law enforcement.  [Id. ¶¶ 55-56].  Given this information, there was probable cause that Correa was involved in drug trafficking and that evidence of drug trafficking was likely to be revealed by intercepting his telephone communications.  The affidavit also sufficiently demonstrated necessity by elaborating on the numerous methods already employed by law enforcement and the outstanding questions agents hoped would be addressed by the wiretaps, including how Correa operationalized his business.  [Id. ¶¶ 94-96].

The June 25 affidavit in support of intercepting TT13 describes how agents had intercepted a call between Correa, using TT13, and J. Martinez discussing drugs sales, and ascertained that there were 31 calls between TT13 and two associates that agents knew from previous interceptions were involved with Correa's drug transactions.  [Dkt. 850-3 ¶¶ 39, 42-43, 42 n.3, 43 n.4].  This is sufficient to show probable cause that a wiretap of TT13 would reveal further communications regarding Correa's operations.  As before, the affidavit demonstrated necessity by elaborating on the methods already employed by law enforcement and the objectives agents hoped would be achieved by an additional wiretap.

Finally, the July 23 affidavit in support of continuing to intercept TT13 describes how the wiretap had already intercepted nine communications between TT13 and associates discussing drug sales and distribution.  [Dkt. 850-4 ¶¶ 58-70; 71-100].  Moreover, it shows how the current

techniques used by law enforcement, including wiretaps, had enhanced agents' understanding of the drug enterprise.  For the first time, LeFebre described how Molina, Rosario, Felix, and "UM2091" fit into Correa's operation.  [Id. ¶ 113].  Based on the evidence that the wiretap of TT13 was helping to generate and the questions it was helping to answer, there was probable cause that further evidence of drug activity would be obtained by extending the wiretap of TT13. The affidavit also demonstrated necessity by elaborating on the methods already employed by law enforcement and the ways in which the wiretaps assisted the investigation.

Correa argues that the affidavits relied on LeFebre's "training and experience" instead of evidence.  However, while LeFebre stated in each affidavit his understanding of how the enterprise worked, none of the facts described above relied upon LeFebre's explanations or interpretations.  Correa next contends that the evidence was stale.  As summarized above, each affidavit referred to specific evidence that was generated shortly before each wiretap application was submitted.  All statements about Targets' previous criminal involvement were included as background and did not factor into the probable cause determination.  Similarly, Correa asserts that the affidavits failed to establish that informants used in the investigation were reliable; however, the affidavits only refer to informants in the context of other methods used by law enforcement, not as a source of evidence in support of probable cause.  Correa's arguments regarding stale evidence and potentially unreliable informants therefore do not undermine the probable cause determination.[12]

As there is no "substantial basis" to disturb Judge Saylor's determination that the affidavits established probable cause and showed that wiretaps were necessary to further the investigation, Correa's Motion to Suppress wiretap evidence [Dkt. 806] is **DENIED**.

---

[12] As explained supra, the warrant was properly issued, therefore Correa's argument that the "good faith" exception does not apply is moot.

### 4.    Search of 190 Carleton Street

Correa contends that the warrant to search his residence lacked probable cause because (1) it provided only conclusory statements about ongoing criminal activity, (2) it relied on the affiant's "training and experience" rather than evidence to establish probable cause, and (3) the information was "stale."  [Dkt. 811 at 4-9].  Correa concludes that the good faith exception does not apply, therefore the fruits of the search of 190 Carleton Street must be suppressed.  [Id. at 9-10].

#### a)    The Affidavit

On December 13, 2021, LeFebre submitted an affidavit in support of the criminal complaint for Correa (among others) and a search warrant of 190 Carleton Street (among other locations).  [Dkt. 1-2].  The affidavit stated the following:

Between April 9 and April 21, 2021, agents executed search warrants on five U.S. Postal Service Priority Mail packages sent by Correa's mother, co-defendant Correa Dones, and Correa's brother, co-defendant Luis Martinez ("L. Martinez") in Puerto Rico to addresses in Massachusetts and New York.  [Id. ¶ 35].  In total, agents seized approximately 5.8 kilograms of cocaine from the packages.  [Id.].  One of the packages was addressed to a residence where DeJesus was living at the time.  [Id. ¶ 36].  That package contained approximately 1,090 grams of cocaine.  [Id.].

On April 16, 2021, agents intercepted a call between Correa and DeJesus during which Correa said, "A half . . . I need one. It's for me."  Correa later asked, "dude, that thing never arrived to your house, bro?"  DeJesus answered, "It never arrived."  Correa responded, "There's five up in the air, son.  Five, son . . . .  I'm not going to be sending anything through the mail." [Id. ¶ 37].

On July 30, 2021, agents seized a package mailed from Puerto Rico to 33 Portland Street, the address of the residential structure where S. Rosario lived.  [Id. ¶ 39].  The package contained half a kilogram of cocaine.  [Id.].  The next day, agents intercepted a call between Correa and someone identified as Richie Gonzalez.  [Id. ¶ 40].  On the call, Correa discussed the person "that works in the mail . . . . Hell, they stole another box from me, bro . . . . Yeah, bro, today." [Id.].  A few days later, agents intercepted a call between Correa and Correa Dones wherein Correa said, "Did they tell you already, one of my boxes didn't make it, mommy . . . .  All of them arrived except mine . . . .  I think it was because I used Sonyi's address a couple of times . . . . 33 Portland . . . .  I cannot use Lawrence any longer, mommy."  [Id. ¶ 42].

On August 20, 2021, agents intercepted a call between Correa and M. Rosario during which Correa asked M. Rosario to retrieve an item and bring it to him.  [Id. ¶ 44].  Agents observed M. Rosario arrive at 33 Portland Street and then observed S. Rosario exit carrying a white plastic bag.  [Id.].  M. Rosario and S. Rosario both transferred items from S. Rosario's car to M. Rosario's car.  [Id.].  M. Rosario then drove away, and a short time later, she was stopped by police, and her car was searched.  [Id.].  Police seized approximately half a kilogram of cocaine from the car.  [Id.].

On October 22, 2021, agents intercepted a call between Correa and co-defendant Luis Perez Frias.  [Id. ¶ 45].  Correa asked, "Did Bebo get that yet?"  Perez Frias responded, "No, I'm still here waiting for the mailman."  Correa asked if the man who had delivered mail the previous day was his regular mailman, to which Perez Frias replied in the negative.  Correa said, "So he was the one that stole the box."  [Id.].  That same day, agents seized a package shipped to J. Martinez at Perez Frias's address.  [Id. ¶ 46].  The package contained half a kilogram of cocaine.

[Id.].  J. Martinez later called and went to the post office attempting to retrieve the package.
[Id.].

In the days leading up to November 1, 2021, agents intercepted calls showing that Correa
had traveled to Connecticut.  [Id. ¶ 48].  Correa expressed frustration, saying, "They obviously
touched it . . .  I keep selling them like that . . . I'm going to lose my people, baby."  [Id.].  On
November 1, 2021, Correa told an associate, "I have that in my garage.  I can pick it up at 5:30."
[Id.].  Shortly before 5:30, Correa was intercepted telling the associate, "I'm going to be ready
shortly.  I'm leaving, like I told you, at 5:30 . . . .  I'll go in, take that out, and head up there."
[Id.].

At approximately 7:04 p.m. that evening, agents observed Correa and a man identified in
the affidavit as "Luis Aponte" leave Correa's residence at 190 Carleton Street and drive to a
Self-Storage location.  [Id. ¶ 49].  Based on pole camera surveillance, Correa entered the storage
unit and then exited carrying a large box-type object, which he placed in the trunk of his car.
[Id.].  Moments later, Correa removed the box-type object from the trunk, returned it to the
storage unit, and drove away.  [Id.].

Agents surveilled Correa and Aponte drive to Connecticut where they met co-Defendant
Victor Ramon Melendez ("Ramon") inside Ramon's parked car.  [Id. ¶ 51].  After they parted
ways, a Connecticut State Police unit stopped Ramon and searched his car.  [Id.].  The Police
seized 1.5 kilograms of cocaine from a hidden compartment inside the car and $15,751 from a
fanny pack also inside the car.  [Id.].  Ramon was arrested on Connecticut state charges.  [Id.].
The next day, Correa was intercepted telling an associate about the arrest.  [Id.].

On November 29, 2021, agents intercepted a call between Correa and co-defendant
Fauris Guerrero Valdez.  [Id. ¶ 71].  On the call, Guerrero Valdez told Correa that he was in New

York but, "I'll head over there in a little bit."  Correa responded, "No, it's cool.  If you are in New York, and you're getting something that's really good— . . . . I haven't worked for two or three days . . . . Let me know when you have something really good, you heard"?  Guerrero Valdez replied, "It'll be for tomorrow."  Correa responded, "So then, tomorrow it is."  [Id.].

In the morning of November 30, 2021, Correa sent an intercepted text message to Guerrero Valdez asking, "At what time I see you?"  [Id. ¶ 73].  Correa suggested in an hour. Guerrero Valdez asked, "Will you want the same?"  Correa responded, "Thirty-seven, buddy." A few hours later, Correa spoke with Guerrero Valdez on the phone, asking him to "Bring me . . . [t]hirty-seven of the good ones.  And, and, and three hundred ten of the curtain."[13]  [Id. ¶ 75].

Later that morning, LeFebre observed Guerrero Valdez, carrying a purple laundry bag, leave his registered address, get into his car, and drive away.  [Id. ¶ 77].  Lawrence Police stopped him and seized a bag of white powder from his waistband that tested positive for acetaminophen, or Tylenol.  [Id. ¶¶ 78-79].  The Officer also discovered a plastic bag containing tan powder and smaller bags of white substance.  [Id. ¶ 78].  Guerrero Valdez was arrested.  [Id. ¶ 80].  That evening, investigators searched Guerrero Valdez's residence and seized 126 grams of fentanyl as well as cutting agent, and a digital scale.  [Id. ¶ 81].

On December 13, 2021, LeFebre sought and obtained a warrant to search nine locations, including 190 Carleton Street, and charged twenty people, including Correa, with drug trafficking violations.  [Id.].

---

[13] LeFebre stated in his affidavit that, based on his training and experience as well as his familiarity with the investigation, he believed that "the good ones" referred to fentanyl and "curtain" referred to cutting agent.  [Dkt. 1-2 ¶ 76].

b)    <u>Probable Cause</u>

As with the previous warrants, Correa contends that LeFebre's affidavit failed to allege that 190 Carleton Street was used for criminal activity.  Specifically, Correa asserts that the affidavit relies on conclusory statements based on LeFebre's training and experience and is based on "stale" information.

The probable cause nexus between enumerated evidence of a crime and a place "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment, and normal inferences as to where a criminal would hide [evidence of a crime]." <u>United States v. Ribeiro</u>, 397 F.3d 43, 49 (1st Cir. 2005) (citing <u>United States v. Charest</u>, 602 F.2d 1015, 1017 (1st Cir. 1979)).

Here, Correa was intercepted speaking about the deliveries of his packages of drugs. [Dkt. 1-2 ¶¶ 37, 39-40, 42, 44-46].  The affidavit describes many instances of Correa orchestrating drug procurement and delivery.  This is sufficient to show probable cause that Correa was committing a drug-related crime.  "[I]n drug cases, there is often probable cause to believe that evidence of the crime will be found where the suspected drug dealer lives." <u>United States v. Dixon</u>, 787 F.3d 55, 60 (1st Cir. 2015), <u>cert. denied</u>, 577 U.S. 911 (2015).  Correa's status as an alleged-drug dealer together with his intercepted communications planning drug transactions near his home is sufficient to show the probable cause nexus that evidence of drug trafficking would be found at his place of residence.

Furthermore, the facts used to establish probable cause were not based on LeFebre's conclusions as a trained and experienced agent or stale evidence.  Rather, the affidavit relies on verbatim transcriptions of Correa's own communications intercepted between April 16, 2021, and November 30, 2021, mere weeks before the warrant application and search.  While

LeFebre's interpretations of "the good ones" (heroin or fentanyl) and "curtain" (cutting agent) are helpful, they are not necessary to understanding that a crime is likely being committed.

Therefore, as there is no "substantive basis" to controvert the presumptive validity of the warrant affidavit or undermine the magistrate judge's probable cause determination, Correa's Motion to Suppress the fruits of the search of 190 Carleton Street [Dkt. 810] is **DENIED**.[14]

### B.    The Alleged Warrantless Search

Correa contends that evidence derived or obtained from use of the pole camera installed overlooking 190 Carleton Street constituted a warrantless "search" under the Fourth Amendment and must be suppressed.  [Dkt. 796].  Correa asserts that, contrary to traditional means of surveillance, the pole camera recorded long-term, continuous footage of Correa's home.  [Id. at 2-3].  Moreover, agents could adjust the camera angle and magnification remotely, and the recoded footage was converted into a searchable log.  [Id. at 3].  Correa argues that because these capabilities exceeded those of in-person, police surveillance, the camera violated his reasonable expectation of privacy.  [Id. at 3-4].

The First Circuit is currently divided as to whether evidence obtained from a pole camera can be a "search" in violation of the Fourth Amendment.  See United States v. Moore-Bush, 36 F.4th 320 (1st Cir. 2022).  However, at the time the officers installed the pole camera, binding First Circuit precedent held that pole-camera surveillance did not constitute a search within the meaning of the Fourth Amendment.  United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009).  Therefore, even if the pole camera surveillance were a search under current doctrine, i.e. Moore-Bush, the evidence is admissible under a good faith exception, because officers who act "in objectively reasonable reliance on binding appellate precedent are not subject to the

---

[14] As explained supra, the warrant was properly issued; therefore, Correa's argument that the "good faith" exceptions do not apply is moot.

exclusionary rule." <u>Moore-Bush</u>, 36 F.4th at 359 (quoting <u>Davis v. United States</u>, 564 U.S. at 232).

      Accordingly, Correa's Motion to Suppress footage derived or obtained from use of the pole camera [Dkt. 796] is **DENIED**.

## IV.    CONCLUSION

      For the foregoing reasons, Defendant's Motions to Suppress [Dkts. 796, 801, 803, 806 and 810] are **DENIED**.

**SO ORDERED**.

Dated: August 22, 2024                 <u>/s/ Angel Kelley</u>
                                    Hon. Angel Kelley
                                    United States District Judge